LINN LAMITIE,
*Plaintiff,*

v.                                                  No. 3:17-cv-753 (VAB)

MIDDLESEX HOSPITAL,
*Defendant.*

**RULING AND ORDER ON MOTION FOR SUMMARY JUDGMENT**

Linn Lamitie ("Plaintiff") sued Middlesex Hospital ("Defendant" or "Hospital") for

discrimination under the Family and Medical Leave Act, 29 U.S.C. § 2611(2) ("FMLA");

Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq.* ("ADA"); and the Connecticut Fair

Employment Practices Act, Conn. Gen. Stat. § 46a-51(15) ("CFEPA"). Complaint, ECF No. 1

("Compl."). Middlesex Hospital has moved for summary judgment. Defendant Middlesex

Hospital's Motion for Summary Judgment, ECF No. 35 ("Def.'s Mot. for Summ. J.").

For the following reasons, the Court **GRANTS** the Hospital's motion for summary

judgment as to the FMLA and ADA.

The Court also declines to exercise supplemental jurisdiction over Ms. Lamitie's CFEPA

claim.

## I.     FACTUAL AND PROCEDURAL BACKGROUND

Middlesex Hospital, a 297-bed, non-profit community hospital in Middletown,

Connecticut, employs over 3,000 people. Affidavit of Gregory Nokes, ECF No. 36-2 ("Nokes

Aff."), at ¶ 4.

On August 10, 2007, Middlesex Hospital hired Linn Lamitie to work approximately

thirty hours per week. Compl., at ¶ 9; Defendant's Local Rule 56(a)(1) Statement of Undisputed

Facts, ECF No. 38 ("Def.'s SUF"),[1] at ¶ 6. She initially worked in Hospital Access before moving to Cash Control and Collections in 2009, where she stayed until the end of her employment at Middlesex Hospital. Compl., at ¶ 12. Ms. Lamitie often worked up to forty hours, when the work was available. Def.'s SUF, at ¶ 7.

Throughout her time at the Hospital, Ms. Lamitie began taking FMLA leave in 2010. *Id.* at ¶ 8. She received FMLA leave in 2010 for a hip injury, in June 2011 to care for her mother, in October 2011 for other health reasons, and leave in November and December 2014 to participate in a group therapy program. *Id.* at ¶ 11; Lamitie Aff., at ¶ 9.

Since July 2013, Ms. Lamitie allegedly has suffered from a depressive disorder and anxiety, which the Hospital has known about throughout this time. Affidavit of Linn Lamitie, ECF No. 42-3 ("Lamitie Aff."), at ¶¶ 3, 4; Def.'s SUF, at ¶ 16.

In October 2014, Middlesex Hospital denied Ms. Lamitie FMLA leave to care for her adult daughter and newborn granddaughter, because the FMLA allegedly did not cover that requested leave. Def.'s SUF, at ¶ 12.

The same month, Ms. Lamitie applied for intermittent leave to address her depression; she remained on this intermittent leave until Middlesex Hospital terminated her. *Id.* at ¶ 14.

A. **Factual Allegations**

On or around December 2014, Ms. Lamitie used two weeks leave under the FMLA to participate in a group therapy program. Compl., at ¶ 16. At that time, she allegedly worked around forty hours per week. *Id.* at ¶ 17.

In response to her FMLA leave, Ms. Lamitie alleges that Diane Eck, who became her supervisor in July 2014, reduced her hours. *Id.* at ¶¶ 15, 18. After bringing the issue to Human

---

[1] The Court only references those undisputed facts that have been admitted by the Plaintiff in Plaintiff's Local Rule 56(A)(2) Statement of Facts in Opposition to Summary Judgment, ECF No. 42-1.

Resources, the Middlesex Hospital allegedly restored some of Ms. Lamitie's hours. *Id.* at ¶ 19.

Ms. Lamitie alleges that she could not go to work on one occasion because of vomiting due to her depression, but Ms. Eck allegedly refused to recognize the absence as FMLA leave. *Id.* at ¶ 20. After bringing this issue to Human Resources, Middlesex Hospital allegedly changed the absence designation to FMLA leave. *Id.* at ¶ 21. Thereafter, Ms. Lamitie alleges that she only had one non-FMLA absence between January 2015 and August 12, 2015. *Id.* at ¶ 22.

In early 2015, Middlesex Hospital switched to an outside vendor for credit card processing, which limited the scope of Ms. Lamitie's work. Deposition of Diane Eck, ECF No. 36-4 ("Eck Dep."), 57:14–60:7. After the switch, Middlesex Hospital had difficulty providing Ms. Lamitie forty hours of work per week. *Id.* at 62:13–64:11.

On or around April 2015, a coordinator position became vacant. Compl., at ¶ 23. According to Ms. Lamitie, Middlesex Hospital gave a vacant coordinator position "to a non-disabled, less qualified employee," even though Ms. Lamitie allegedly performed most of the duties of the position at the time. *Id.* at ¶¶ 23–25. Ms. Lamitie went to Human Resources about not getting the position; although allegedly told there would be an investigation, Ms. Lamitie claims that Human Resources never communicated the results of the investigation. *Id.* at ¶ 26.

Middlesex Hospital allegedly filled the vacant position by adding a twenty-hour-per-week employee and re-assigning other duties among the remaining employees in the Cash Control and Collection Office. Def.'s SUF, at ¶ 51. This restructure of the department allegedly resulted in discord between Ms. Lamitie and Diane Eck. *Id.* at ¶ 52.

By June 2015, Diane Eck believed that Ms. Lamitie was "struggling to stay focused on the task at hand," "struggling to complete her work," "easily distracted, and making errors." Eck Dep. 75:10–16. Ms. Eck then began working with Susan DeToro in Human Resources regarding

Ms. Lamitie's schedule. *Id.* at 76:13–77:7. Pat Neisser, Sarah DeToro, Wallicia McNeil, and Diane Eck met regarding Ms. Lamitie's "performance, her attitude, her insubordination." *Id.* at 80:2–17.

On or around July 2015, Ms. Eck allegedly directed Ms. Lamitie to change her lunch time from 1:00 p.m. to 11:30 a.m. Compl., at ¶ 27. Even though Ms. Lamitie stated that she needed to take lunch during that time to make personal calls and schedule medical appointments, Ms. Eck refused to allow Ms. Lamitie to keep her 1:00 p.m. lunch time. *Id.* at ¶¶ 27, 28. In addition, Ms. Eck "instructed the plaintiff that she was to tell Eck when each of her medical appointments were. The plaintiff declined to do so." *Id.* at ¶ 29.

In the beginning of August 2015, Ms. Lamitie's therapist renewed her FMLA leave paperwork—and specifically suggested that she be permitted to maintain her 1:00 p.m. lunch time. *Id.* at ¶ 30.

Ms. Lamitie allegedly provided Middlesex Hospital with her FMLA paperwork either on August 7 or August 10, 2015. Lamitie Aff., at ¶ 17

### 1. Involuntary Leave of Absence

On or around August 12, 2015, Ms. Lamitie was had to attend a meeting with Human Resources personnel. Compl., at ¶ 32. During the meeting, Pat Neisser, one of the Middlesex Hospital's directors, allegedly "told the plaintiff that she could not return to her job." *Id.* at ¶ 33. When Ms. Lamitie asked why, Wallicia McNeil, who also worked in Human Resources, allegedly told her that she would receive assistance in finding another job at Middlesex Hospital. *Id.* at ¶ 34. Ms. Lamitie requested to return to her desk for her personal belongings, but she was not allowed and instead had to give back her Middlesex Hospital identification. *Id.* at ¶ 35.

Middlesex Hospital kept Ms. Lamitie on the payroll until she was terminated on

March 31, 2016. *Id.* at ¶ 36. During this period, Ms. Lamitie could not find other work and also could not volunteer for work at Middlesex Hospital. *Id.* at ¶¶ 37–41.

Middlesex Hospital allegedly based its decision on Ms. Lamitie's continued disruptive behavior and difficulty with her co-workers. Nokes Aff., at ¶¶ 6, 7. And the "arrangement was never intended to be for an indefinite paid leave, and Ms. Lamitie was on notice that this was the case." *Id.* at ¶ 8. Ultimately, the situation "just wasn't working. And so [the Hospital] had to figure out what [Hospital staff] needed to do. And part of that was to remove her from her position." Wallicia McNeil, ECF No. 36-5 ("McNeil Dep."), at 22:20–22.

### 2. Termination

In January 2016, Middlesex Hospital put Ms. Lamitie on a March 31, 2016 deadline to find a new position. Nokes Aff., at ¶ 9. During this interim period, Middlesex Hospital paid Ms. Lamitie, even though she was not working, an arrangement not intended to be indefinite. McNeil Dep. 22:23–23:10.

Ms. Lamitie alleges that up until her termination on May 31, 2016, she never received any written disciplinary action. Compl., at ¶ 14.

Ms. Lamitie allegedly also suffers from extreme emotional distress from being forced to leave her position and continues to suffer from lost wages and employment benefits from her termination. *Id.* at ¶¶ 42–43.

Middlesex Hospital claims not to have known that Ms. Lamitie had been employed at MedConn in August 2015, while still working for Middlesex Hospital or that she had not been clocking out during her therapy appointments. Nokes Aff., at ¶ 10–11. Middlesex Hospital alleges that either the alternative employment or not clocking out during her therapy appointments would have been grounds for termination. *Id.*

### 3. Administrative Proceedings

On July 11, 2016, Ms. Lamitie brought a disability discrimination charge against

Middlesex Hospital before the Equal Employment Opportunity Commission ("EEOC") and the

Connecticut Commission on Human Rights and Opportunities ("CHRO"). Compl., at ¶ 4. On

February 17, 2017, CHRO released jurisdiction over Ms. Lamitie's case. *Id.* On February 27,

2017, the EEOC issued a right to sue letter for Ms. Lamitie's case. *Id.*

### B. Procedural History

On May 8, 2017, Linn Lamitie sued Middlesex Hospital for discrimination under FMLA,

ADA, and CFEPA discrimination. Compl.

On July 5, 2017, Middlesex Hospital answered the Complaint. Answer with Special

Defenses, ECF No. 13.

On November 8, 2018, Middlesex Hospital moved for summary judgment. Def.'s Mot.

for Summ. J.

On January 7, 2019, Ms. Lamitie filed a Memorandum in Opposition to the Hospital's

Motion for Summary Judgment. Memorandum in Opposition regarding Defendant's Motion for

Summary Judgment, ECF No. 42 ("Pl.'s Mem. in Opp'n. to Mot. for Summ. J.").

On February 5, 2019, the Hospital replied to Ms. Lamitie's opposition. Defendant

Middlesex Hospital's Reply Memorandum in Further Support of its Motion for Summary

Judgment, ECF No. 45 ("Reply").

On April 30, 2019, the Court held a hearing on the Hospital's motion for summary

judgment.

## II. STANDARD OF REVIEW

A motion for summary judgment will be granted when the record shows no genuine issue

as to any material fact, and the movant is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of establishing the absence of a genuine dispute of material fact. *Celotex Corp. v. Cartrett*, 477 U.S. 317, 323 (1986). The non-moving party may defeat the motion by producing specific facts to prove that there is a genuine issue of material fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986).

"[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Id.* at 247–48 (emphasis in original). The moving party, however, may satisfy this burden by pointing to an absence of evidence to support the non-moving party's case. *See PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 105 (2d Cir. 2002) (per curiam).

When documentary evidence and sworn affidavits supporting a motion for summary judgment "demonstrate[] the absence of a genuine issue of material fact," the non-moving party must do more than vaguely assert the existence of some unspecified disputed material facts or "rely on conclusory allegations or unsubstantiated speculation." *Robinson v. Concentra Health Servs., Inc.*, 781 F.3d 42, 44 (2d Cir. 2015) (citation omitted).

The party opposing the motion for summary judgment then "must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Id.*; *see also Atkinson v. Rinaldi*, 3:15-cv-913 (DJS), 2016 WL 7234087, at *1 (D. Conn. Dec. 14, 2016) (holding non-moving party must present evidence that would allow reasonable jury to find in his favor to defeat motion for summary judgment); *Pelletier v. Armstrong*, 3:99-cv-1559 (HBF), 2007 WL 685181, at *7 (D. Conn. Mar. 2, 2007) ("[A] nonmoving party must present 'significant probative evidence to create genuine issue of material fact.'" (quoting *Soto v.*

*Meachum*, 3:90-cv-270 (WWE), 1991 WL 218481, at *6 (D. Conn. Aug. 28, 1991)).

A court must view any inferences drawn from the facts in the light most favorable to the party opposing the summary judgment motion. *Dufort v. N.Y.C.*, 874 F.3d 338, 347 (2d Cir. 2017). A court will not credit conclusory allegations or denials. *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011). After drawing all inferences in favor of the non-moving party, if the court finds that no reasonable trier of fact could find in the non-movant's favor, the court will find for the moving party as a matter of law and grant the summary judgment motion. *See Anderson*, 477 U.S. at 248 ("summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.").

## III.  DISCUSSION

### A.  The FMLA Claim

The FMLA "entitle[s] employees to take reasonable leave for medical reasons, for the birth or adoption of a child, and for the care of child, spouse, or parent who has a serious health condition." 29 U.S.C. § 2601(b)(1). "The FMLA's central provision guarantees eligible employees 12 weeks of leave in a 1-year period following certain events: a disabling health problem; a family member's serious illness; or the arrival of a new son or daughter." *Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 86 (2002) (citing 29 U.S.C. § 2612(a)(1)).

The Act further entitles the employee "to be restored to an equivalent position with equivalent employment benefits, pay, and other terms of employment." 29 § 2614. And "[i]t shall be unlawful for any employer to interfere with, restrain or deny the exercise or the attempt to exercise any right provided" by the Act. 29 U.S.C. § 2615. The law "creates a private right of action to seek both equitable relief and money damages against any employer (including a public

agency) in any Federal or State court of competent jurisdiction should that employer interfere with, restrain, or deny the exercise of FMLA rights." *Sista v. CDC Ixix N. Am., Inc.*, 445 F.3d 161, 174 (2d Cir. 2006).

Under the FMLA, an employer may not retaliate against an employee for exercising their FMLA rights. *See Potenza v. N.Y.C.*, 365 F.3d 165, 167 (2d Cir. 2004). A prima facie case of FMLA retaliation requires that the Plaintiff establish "(1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action." *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir. 2005). "If the plaintiff makes out a prima facie case, the defendant must demonstrate a legitimate, non-discriminatory reason for its actions; if the defendant does so, the plaintiff must then show that defendant's proffered explanation is pretextual." *Graziado v. Culinary Institute of Am.*, 817 F.3d 415, 429 (2d Cir. 2012) (*Van Zant v. KLM Royal Dutch Airlines*, 80 F.3d 708, 714 (2d Cir. 1996)).

In evaluating a retaliation claim, "the court's role in evaluating a summary judgment request is to determine only whether proffered admissible evidence would be sufficient to permit a rational finder of fact to infer a retaliatory motive." *Jute*, 420 F.3d at 173 (citing *Donahue v. Windsor Locks Bd. of Fire Comm'rs.*, 834 F.2d 54, 48 (2d Cir. 1987)). Retaliation claims thus proceed in three parts. First, "[i]f a plaintiff sustains the initial burden, a presumption of retaliation arises." *Id.* Second, "the onus falls on the employer to articulate a legitimate, non-retaliatory reason for the adverse employment action." *Id.* (citing *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 768 (2d Cir. 1998)). Third, "once an employer offers such proof, the presumption of retaliation dissipates and the employee must show that retaliation was a substantial reason for the adverse employment action." *Id.* (citing *Fields v. N.Y. State Office of*

*Mental Retardation & Developmental Disabilities*, 115 F.3d 116, 120–21 (2d Cir. 1997)).

In support of its motion for summary judgment, Middlesex Hospital argues that Ms. Lamitie exercised her FMLA rights without issue for five years before being removed from her position in August 2015. Defendant Middlesex Hospital's Memorandum of Law in Support of its Motion for Summary Judgment, ECF No. 37 ("Def.'s Mem. in Supp. of Summ. J."), at 16. Based on the lack of temporal connection between Ms. Lamitie's exercise of FMLA leave and her termination, Middlesex Hospital argues that its employment actions could not have been retaliatory. *Id.* at 16–17.

Middlesex Hospital also argues that there were multiple intervening bouts of disruptive or inappropriate conduct that led to termination, *id.* at 17, and that these are non-discriminatory reasons for its actions—not discriminatory animus for taking FMLA leave. *Id.* at 18.

Finally, Middlesex Hospital argues that there are alternative grounds for termination, negating the alleged claims of discrimination. Ms. Lamitie supposedly started working thirty hours a week for another company, while still employed at Middlesex Hospital and without informing Middlesex Hospital staff. *Id.* Ms. Lamitie also admitted to attending therapy sessions without clocking out, which led to Middlesex Hospital overpaying her. According to Middlesex Hospital, these issues negate Ms. Lamitie's claim for reinstatement as equitable relief.

In response, Ms. Lamitie argues that the temporal proximity of Ms. Lamitie's July 30, 2015 FMLA certification and disputes regarding the underlying facts of her termination all support an inference of discriminatory FMLA retaliation. Pl.'s Mem. in Opp'n to Def.'s Mot. for Summ. J., at 21. Ms. Lamitie also argues that the lack of discussion of her FMLA certification by Human Resources employees and questions of pretext with the Hospital's disregard of existing policies preclude summary judgment and that a reasonable jury could find that there was FMLA

discrimination. *Id.*

In reply, Middlesex Hospital argues that Ms. Lamitie had been on FMLA leave for months before she was removed from her position, that Ms. Lamitie's conduct was under review before she submitted her FMLA certification, and that eight months lapsed between the time Ms. Lamitie submitted her last FMLA certification and the termination of her employment. Reply, at 7. Moreover, Middlesex Hospital argues that there was no discriminatory pretext for Ms. Lamitie's termination because she refused to change her schedule, inappropriately interacted with employees, and she still received eight months of paid leave, which far exceeds the Hospital's FMLA obligations. *Id.* at 8. Finally, Middlesex Hospital asserts that there is insufficient evidence for an FMLA claim because Ms. Lamitie had taken approved FMLA leave multiple times for years and was never discharged for exercising her FMLA rights. *Id.*

The Court agrees.

In this case, there are three potential FMLA violations stemming from: (1) the March 2015 employee conduct warning; (2) the August 12, 2015 involuntary paid leave; and (3) the March 31, 2016 termination. For the following reasons, Ms. Lamitie fails to make a prima facie FMLA case or otherwise meet her evidentiary burden at this stage of the case for any of these potential violations.

### 1.    March 2015 E-Mails

In March of 2015, Middlesex Hospital had notice that Ms. Lamitie may have needed FMLA leave; Ms. Lamitie had been diagnosed with depression and notified Middlesex Hospital of this diagnosis in 2013. Lamitie Aff., at ¶¶ 3, 4; Def.'s SUF, at ¶ 16. Specifically, on January 5, 2015, Ms. Lamitie received an FMLA certification regarding the potential need for her to take future psychiatric FMLA Leave. January 5, 2015 FMLA Certification, ECF No. 42-8. Ms.

Lamitie therefore meets the first two prongs of a prima facie FMLA claim: there is a protected FMLA activity and Middlesex Hospital had notice of this protected FMLA activity.

In March of 2015, however, Ms. Lamitie cannot show that there was an adverse employment action tied to the exercise of her January 5, 2015 FMLA rights. "[A] materially adverse action is any action by the employer that is likely to dissuade a reasonable worker in the plaintiff's position from exercising his [or her] legal rights." *Millea v. Metro N. R.R. Co.*, 658 F.3d 154, 164 (2d Cir. 2011). In March 2015, however, there was no action that would dissuade a reasonable worker from exercising their legal rights.

Instead, there were e-mail conversations between Ms. Lamitie and Ms. Eck regarding work hours,[2] e-mail conversations between Ms. Lamitie and Mr. Nokes regarding work hours and Ms. Lamitie's out-of-work life events,[3] and an e-mail conversation between Ms. Lamitie and Mr. Nokes regarding work hours and potential job relocation of Ms. Lamitie.[4] These e-mail conversations, however, are not adverse employment actions. *See Beyer v. Cty. of Nassau*, 524 F.3d 160, 163 (2d Cir. 2008) ("Employment actions that we have 'deemed sufficiently disadvantageous to constitute an adverse employment action include 'a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . unique to a particular situation.'" (internal quotation marks and citation omitted)); *see also Shultz v. Congregation Shearith Israel of N.Y.C.*, 867 F.3d 298, 310–11 (2d Cir. 2017) (holding that negative comments about a pre-marital pregnancy, encouraging other employees not to speak to

---

[2] March 17, 2015 E-Mail, Ex. H. ECF No. 36-9.
[3] March 18, 2015 E-Mail, Ex. CC, ECF No. 36-29.
[4] March 18, 2015 E-Mail, Ex. AA, ECF No. 36-27 ("I have tried to intercede to ensure that you are being treated fairly with regard to your hours, and I will continue to do so, but it seems that no matter what happens you interpret it negatively. Based on your recent emails, I do not see any real likelihood that will change, regardless of the hours. I therefore am to the point where I think you need to find a position outside of this department.").

plaintiff, and distributing negative statements about the plaintiff "did not meet the standard for a materially adverse action" to support a Title VII retaliation claim).

Because there was no adverse employment action, the Court need not determine whether there was a causal connection or retaliatory intent.

Accordingly, for the actions alleged in March of 2015, Ms. Lamitie lacks a viable FMLA claim.

### 2. August 12, 2015 Involuntary Paid Leave

#### a. Notice Requirements

In August of 2015, Middlesex Hospital also had notice that Ms. Lamitie may have needed FMLA leave. Ms. Lamitie had been diagnosed with depression and notified Middlesex Hospital of this diagnosis in 2013. Lamitie Aff., at ¶¶ 3, 4; Def.'s SUF, at ¶ 16. On July 29, 2015, Ms. Lamitie's therapist renewed her FMLA paperwork, stating that "Patient will require time away from work for psychiatric appointments &/or more intensive interventions depending on nature, severity, & progression of other symptoms or illness." Certification of health Provider for Employee's Serious Health Condition, ECF No. 36-39 ("July 29, 2015 FMLA Certification").

The certification also stated that Ms. Lamitie "<u>may</u> be [incapacitated due to her medical condition] in the future if her condition worsens" and that she "currently faces destabilizing psychosocial stressors & and needs consistency in her schedule. She emphasizes that varying lunch breaks are distressing. I recommend a consistent break from 1:00 to 1:30." *Id.* Ms. Lamitie then allegedly provided Middlesex Hospital with her FMLA paperwork either on August 7 or August 10, 2015. Lamitie Aff., at ¶ 17.

Because Ms. Lamitie asserted her FMLA rights in August, and Middlesex Hospital had notice of her FMLA rights, Ms. Lamitie has satisfied the first two prongs of a prima facie case of

FMLA retaliation.

### b.     Adverse Employment Action

Although Ms. Lamitie can establish the first two prongs of an FMLA claim in August 2015, she again cannot establish that there was an adverse employment action tied to the exercise of her July 29, 2015 FMLA certification. Under the FMLA, "forced leave, by itself, does not violate any right provided by the FMLA." *Sista*, 445 F.3d at 176. Moreover, the FMLA "does not create a right to be free from suspension with or without pay, nor does the FMLA create a right against infliction of emotional distress, which is the crux of [Plaintiff]'s claim here." *Id.* at 175.

Rather, a plaintiff must "demonstrate that such a forced leave interfered with, restrained, or denied the exercise or attempted exercise of a right provided under the FMLA." *Id.* (citing 42 U.S.C. §§ 2615(a), 2617(a)). Generally, "being placed on paid administrative leave may not be an adverse employment action because 'an employee does not suffer a materially adverse change in terms and conditions of employment.'" *Santiago v. Dep't of Transp.*, 50 F. Supp. 3d 136, 157 (D. Conn. 2014) (Arterton, J.) (citation omitted).

Because an employer's imposition of involuntary FMLA leave—by itself—is not an actionable adverse employment action under the FMLA, Ms. Lamitie must provide additional evidentiary support to show that there was an adverse employment action. From August 12, 2015 until March 31, 2016, Middlesex Hospital, however, both provided Ms. Lamitie with leave and paid her during this leave, both of which exceeded any entitlement she had under the FMLA. *See Ragsdale*, 535 U.S. at 86 ("The FMLA's central provision guarantees eligible employees 12 weeks of leave in a 1-year period following certain events . . . ." (citing 29 U.S.C. § 2612(a)(1)).

As a result, there was no adverse employment action. *See Joseph v. Leavitt*, 465 F.3d

87, 91 (2d Cir. 2006) ("an employee does not suffer a materially adverse change in the terms and conditions of employment where the employer merely enforces its preexisting disciplinary policies in a reasonable manner"); *Lewis v. Boehringer Ingelheim Pharm., Inc.*, 79 F. Supp. 3d 394, 416 (D. Conn. 2015) (holding that the Plaintiff did not make a prima facie retaliation claim because "Plaintiff appear[ed] to have been awarded (whether by mistake or not) more FMLA leave than she was entitled to, additional leave on top of that, and (eventual) reinstatement.") (Arterton, J.).

### c.    Causal Connection

In any event, even if this was an adverse employment action, there is no causal connection between her involuntary paid leave and retaliatory intent. In order to establish a prima facie case at summary judgment a plaintiff must also demonstrate that "a causal connection exists between the protected activity and the adverse action, *i.e.*, that a retaliatory motive played a part in the adverse employment action." *Sista*, 445 F.3d at 177 (denying leave to amend for claims involving FMLA and ADA retaliation) (internal citations omitted).

A causal connection can be established through temporal proximity. *See, e.g.*, *Donnelly v. Greenberg Cent. Sch. Dist. No. 7*, 692 F.3d 134, 152 (2d Cir. 2012) (reversing a grant of summary judgment where plaintiff had demonstrated temporal proximity and the evidence provided "a sufficient basis to send the question of the school's retaliatory intent to the jury to reach a final determination."). But in cases where "timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise." *Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 95 (2d Cir. 2001); *see Sotomayor v. N.Y.C.*, 713 F.3d 163, 164 (2d Cir. 2013) (finding no prima facie case of FMLA retaliation where the plaintiff began receiving

negative evaluations and letters in her file before her application for her first FMLA leave); *see also Elliot-Leach v. N.Y.C. Dept. of Educ.*, 710 F. App'x 449, 452 (2d Cir. 2017) ("Because [Plaintiff] had been disciplined for work absences before she requested FMLA leave, and because she relies only on temporal proximity to suggest retaliatory intent, her retaliation claim fails.").

Here, aside from temporal proximity, the record lacks support of a causal connection between Ms. Lamitie's assertion of FMLA rights and her involuntary paid leave. Ms. Lamitie allegedly provided Middlesex Hospital with her FMLA paperwork either on August 7 or August 10, 2015. Lamitie Aff., at ¶ 17. On August 12, 2016, the Hospital involuntarily suspended Ms. Lamitie. *Id.* at ¶¶ 18, 22. Neither in her filings nor during the hearing on this motion did Ms. Lamitie cite to evidence from either the two- or five-day period between the provision of her July 29, 2015 FMLA certificate to Middlesex Hospital and her suspension probative of Middlesex Hospital's retaliatory intent.

While the record does not indicate that Ms. Lamitie's supervisors disparaged her or otherwise expressed concern with her taking this FMLA leave, the record does contain numerous references about her alleged insubordination and performance. *See* Eck Dep. 80:2–81:18. As one of Middlesex Hospital's managers put it, there is a "history of insubordination, disruptive behavior, and that the hospital was making every effort to work with her. She had been there for a long time exhibiting a lot of the same behavior." McNeil Dep., at 11:15–25.

Even by Ms. Lamitie's own account of her August 2015 involuntary leave, the purpose was to secure alternative employment for her. *See* Linn Lamitie Deposition, ECF No. 36-3 ("Lamitie Dep."), at 192:2–6 ("Q. Okay. What did [Wallicia] McNeil do to you that you believe was discriminatory? A. She removed me from my position and told me I would find a -- she was

going to help me find a better job, one that I would like more."). Indeed, she started working as a part-time collection agent for MedConn that same month. Lamitie Dep. 85:3–7 ("Q. You currently work for another company; correct? A. Correct. Q. What's the name of that company? A. MedConn."); 90:17–19 ("Q. Okay. And you've worked there since August of 2015 in comes capacity? A. Yes.").

Ms. Lamitie nevertheless argues that retaliatory intent should be inferred from a Middlesex Hospital policy and an administrator's deposition testimony.

The Court disagrees.

Ms. Lamitie argues that Middlesex Hospital's policy of instituting performance improvement plans for struggling employees, and its failure to implement such a plan for Ms. Lamitie, is probative of retaliatory intent under FMLA. But Middlesex Hospital's performance improvement plan policy only "provides general guidelines. It does not constitute a contract or guarantee of any specific process or level of discipline, and all employment at the Health System remains 'at-will.'" Middlesex Health System Human Resources Policy Manual, ECF No. 42-9. Because this policy is discretionary and not mandatory, its mere existence does not establish a causal connection between any alleged adverse employment action and Ms. Lamitie's requests for FMLA leave. *See Sista*, 445 F.3d at 175 (finding that the FMLA "does not create a right to be free from suspension with or without pay, nor does the FMLA create a right against infliction of emotional distress, which is the crux of [Plaintiff]'s claim here.").

Moreover, there is nothing in the record to suggest that Middlesex Hospital's failure to implement a performance improvement plan for Ms. Lamitie is probative of a difference in treatment between employees who seek to assert their FMLA rights and those who do not. In other words, Ms. Lamitie's FMLA retaliation claim cannot be premised on whether Middlesex

Hospital does or does not implement performance improvement plans for all of its employees, but instead must be based on whether Middlesex Hospital treats those who are on FMLA leave differently from those who do not seek FMLA leave in how performance improvement plans are offered or implemented. *See Potenza*, 365 F.3d at 168 (recognizing that an adverse employment action must "occur under circumstances giving rise to an inference of retaliatory intent").

Ms. Lamitie does put forth another employee's performance improvement plan in support of her claim of FMLA retaliation. *See* Pl.'s Ex. 8, July 20, 2015 Performance Improvement Plan, ECF No. 42-10. But Ms. Lamitie "must show that she was similarly situated in all material respects to the individuals with whom she seeks to compare herself." *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000) (citation and internal quotation marks omitted). And there is nothing in this record to support such a showing. This evidence, which would be probative of retaliatory intent under the FMLA, is what Ms. Lamitie lacks. *See Goldfarb v. Town of W. Hartford*, 474 F. Supp. 2d 356, 368 (D. Conn. 2007) (granting a motion for summary judgment where the defendant "has provided no evidence from which a jury could reasonably find that other [defendant] employees who took sick or FMLA leave were prima facie similarly situated to [Plaintiffs]") (Squatrito, J.).

Ms. Lamitie also argues that Wallicia McNeil, the Hospital's Director of Employee Relations and Talent Management, stated that it would be rare to remove an employee without a prior record of discipline. Ms. Lamitie further argues that Middlesex Hospital should not have terminated Ms. Lamitie because she had no prior disciplinary issues, while working at the Hospital. When asked whether it would "be unusual for there to be a discussion about removing an employee from their position when the employee had not previously been disciplined in any way," Ms. McNeil responded "[y]es." McNeil Dep. 15:2–6.

But this statement from Ms. McNeil—alone—would not be sufficient to create a genuine issue of fact as to whether Middlesex Hospital acted with retaliatory intent in violation of Ms. Lamitie's FMLA rights. Because when asked the very next question, "were you aware of any disciplinary action that had been taken," Ms. McNeil responded that "in Linn Lamitie's case, you know, for insubordination, she would have been fired. My question to Greg [was] . . . why was she not terminated years before? Why was she still there being insubordinate and disruptive? . . . And our policy does not speak to that in terms of insubordination" *Id.* at 15:7–18. Ms. McNeil then added, when asked whether "the hospital's policy obviously does not require that every single form of disciplinary action be taken, that's determined by the severity of the behavior," to which Ms. McNeil responded "[y]es." *Id.* at 15:19–23.

Ms. McNeil's testimony is thus consistent with the discretionary text of the Middlesex Hospital's performance improvement policy, not in tension with it. *See* Middlesex Health System Human Resources Policy Manual, ECF No. 42-9 ("It does not constitute a contract or guarantee of any specific process or level of discipline, and all employment at the Health System remains 'at-will.'"). More importantly, Ms. McNeil's testimony does not create a genuine issue of fact as to whether Ms. Lamitie should have been terminated or Middlesex Hospital failed to follow any general or specific hospital policy or procedure in terminating her. *See* McNeil Dep. at 15:7 ("in Linn Lamitie's case, you know, for insubordination, she would have been fired."); *see also Robinson*, 781 F.3d at 44 (noting that "a plaintiff may not survive summary judgment merely by conjuring a hypothetical issue of material fact.").

At this stage of the case, the Court is to "determine only whether proffered admissible evidence would be sufficient to permit a rational finder of fact to infer a retaliatory motive." *Jute*, 420 F.3d at 173 (citing *Donahue*, 834 F.2d at 48 (2d Cir. 1987)). On this record, no reasonable

jury could infer a retaliatory intent in response to Ms. Lamitie's requests for FMLA leave from Ms. McNeil's testimony.

Accordingly, there is no causal connection between Ms. Lamitie's termination and her exercise of her FMLA rights.

### d.       The Legitimate Non-Discriminatory Reason

Even if Ms. Lamitie could establish a prima facie case of FMLA discrimination, the burden would shift to Middlesex Hospital to provide a legitimate non-discriminatory reason for Ms. Lamitie being placed on involuntary leave. And Middlesex Hospital has: Ms. Lamitie's performance.

Ms. Lamitie had issues with her co-workers as early as 2009, which caused her to be moved to a new position within the Hospital. Nokes Aff., at ¶ 7. And as early as December 2014, Diane Eck had concerns with Ms. Lamitie's lack of respect, insubordination, and task management. Eck Dep., at 29:15–30:3; 33:20–34:3. Indeed, around this time. Ms. Eck created a daily list for everyone in the department. Eck Dep., at 34:4–35:13.

In March 2015, Mr. Nokes indicated that Ms. Lamitie would need to leave the department for a new role, either inside or outside of the Hospital. An e-mail from Mr. Nokes to Ms. Lamitie states that he "d[id] not agree that any specific numbers of hours are guaranteed to anyone." Re: Hours E-Mail, Exhibit AA, ECF No. 36-27. Mr. Nokes also stated that he did "not see any real likelihood that will change, regardless of the hours." *Id.* He then added that "I therefore am to the point where I think you need to find a position outside of this department. I know that you have made some efforts to do so, and I suggest that we should continue to work towards that end. If we are unable to do that within the Health System we will help in your transition to another opportunity." *Id.*

Ms. Lamitie's alleged insubordination included "[r]efusing to do the work, refusing to comply with the requests and expectations of the manager or supervisor. Telling the manager or supervisor that they were not going to do what was asked of them. Tone and style of email responses to their manager as well as to the VP and a number of those types of behaviors." McNeil Dep., at 15:24–16:7. Ms. Lamitie also allegedly refused to do her work and comply with the expectations of her job. *Id.* at 16:8–15. "[T]hese offers of proof satisfy [Defendant]'s burden of articulating legitimate, non-retaliatory reasons to explain the actionable claims of adverse employment action." *See Jute*, 420 F.3d at 180.

As a result of Middlesex Hospital's legitimate non-discriminatory reason for its employment decision in August of 2015, Ms. Lamitie carries the ultimate burden of establishing there is evidence of retaliatory intent behind her involuntary leave. Nothing in this record, however, suggests that there was any discussion of Ms. Lamitie's health or her taking of FMLA leave. McNeil Dep., at 12:4–7; 17:13–25. Also, as discussed above, in analyzing her prima facie case, Ms. Lamitie has otherwise failed to provide evidentiary support of retaliatory intent.

Accordingly, Ms. Lamitie does not have a viable FMLA retaliation claim based on Middlesex Hospital's decision to place her on involuntary leave in August of 2015.

### 3. March 31, 2016 Termination

Finally, with respect to Ms. Lamitie's FMLA retaliation claim, there is Middlesex Hospital's decision on March 31, 2016 to terminate her. At that time, as with the two other periods discussed above, Middlesex Hospital had notice that Ms. Lamitie may have needed FMLA leave, and that she had been diagnosed with depression and notified Middlesex Hospital of this diagnosis in 2013. Lamitie Aff., at ¶¶ 3, 4; Def.'s SUF, at ¶ 16. On August 7 or 10, 2015, Ms. Lamitie also allegedly provided Middlesex Hospital with her FMLA paperwork. Lamitie

Aff., at ¶ 17. Moreover, the termination does constitute an adverse employment action. *See Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 85 (2d Cir. 2015).

Because Ms. Lamitie asserted her FMLA rights in August, Middlesex Hospital had notice of her FMLA rights, and termination is an adverse employment action, Ms. Lamitie has established the first three prongs of a prima facie case of FMLA retaliation.

Although termination is one of the paradigmatic examples of an adverse employment action, *see Vega*, 801 F.3d at 85, "the Second Circuit has suggested that a terminated plaintiff must also show that the employer 'considered [the exercise of FMLA rights] a negative factor in its decision to terminate [her].'" *Hewett v. Triple Point Tech., Inc.*, 171 F. Supp. 3d 10, 16 (D. Conn. 2016) (citing *Sista*, 445 F.3d at 176) (Underhill, C.J.). Ms. Lamitie, however, again fails to point to evidence in the record to support the claim that there is a causal connection between her termination and her exercise of FMLA rights. Indeed, Ms. Lamitie does not point to anything that happened between August 12, 2015 and March 31, 2016—the intervening period from the start of the involuntary paid leave until the termination—that suggests her termination had anything to do with her taking FMLA leave. And for the reasons discussed above, all of the arguments made by Ms. Lamitie in support of a causal connection, particularly with respect to retaliatory intent, have been addressed and rejected.

In any event, even if Ms. Lamitie could make out a prima facie case, Middlesex Hospital has a legitimate non-discriminatory reason for her termination, as discussed above: her performance. And, as discussed above, Ms. Lamitie cannot carry her ultimate burden of demonstrating that there is a genuine issue of fact regarding her FMLA retaliation claim. [5]

---

[5] Significantly, while the Court has divided Ms. Lamitie's FMLA retaliation claim into three distinct periods, if this period of time was viewed as a single period, her FMLA retaliation claim still fails for all of the reasons that her claims fails when divided into three parts. Put differently, the whole of Ms. Lamitie's FMLA retaliation claim fares no better than its various parts. *Cf. Jute*, 420 F.3d at 173 ("the court's role in evaluating a summary judgment

Accordingly, the Court will grant Middlesex Hospital's motion for summary judgment as to Ms. Lamitie's FMLA claim.[6]

## B.     The ADA Claim

The ADA established that "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions and privileges of employment." 42 U.S.C. § 12112(a). Courts must apply a burden shifting analysis to determine ADA discrimination where the plaintiff "must establish a prima facie case; the employer must offer through the introduction of admissible evidence a legitimate nondiscriminatory reason for the discharge; and the plaintiff must then produce evidence and carry the burden of persuasion that the proffered reason is a pretext." *Sista*, 445 F.3d at 169.

In the Second Circuit, a plaintiff must show that "by a preponderance of the evidence that: (1) [her] employer is subject to the ADA; (2) [she] was disabled within the meaning of the ADA; (3) [she] was otherwise qualified to perform the essential functions of [her] job, with or without reasonable accommodation; and (4) [she] suffered adverse employment action because of [her] disability." *McMillian v. N.Y.C.*, 711 F.3d 120, 125 (2d Cir. 2013) (quoting *Sista*, 445 F.3d at 169). For both failure-to-accommodate and adverse employment action claims, the plaintiff "bears the burdens of both production and persuasion as to the existence of some accommodation that would allow [the plaintiff] to perform the essential functions of [the plaintiff's] employment." *Id.* at 126 (quoting *McBride v. BIC Consumer Prods. Mfg. Co., Inc.*, 589 F.3d 92, 97 (2d Cir. 2009)).

---

request is to determine only whether proffered admissible evidence would be sufficient to permit a rational finder of fact to infer a retaliatory motive").

[6] Because the Court otherwise determines that Ms. Lamitie lacks a viable FMLA claim, the Court need not address the Hospital's alternative arguments as to the propriety of her termination or any allegedly related damages.

Middlesex Hospital argues that a disability discrimination claim under the ADA must be filed within 300 days of the alleged discrimination. Def's Mem. in Supp. of Summ. J., at 19. Middlesex Hospital contends that Ms. Lamitie did not file her administrative complaint until July 11, 2016, which would make conduct occurring prior to September 15, 2015 impermissible. *Id.* at 20. As a result, Middlesex Hospital argues that the only potentially actionable claim is Ms. Lamitie's March 31, 2016 termination. *Id.*

Additionally, Middlesex Hospital argues that Ms. Lamitie's removal from her position stems from performance and insubordination, not discriminatory animus. *Id.* And Middlesex Hospital contends that Ms. Lamitie is unable to show that her caused her termination because no one that engaged in similar conduct remained employed by the Hospital. *Id.* at 20–21.

Even if Ms. Lamitie were to establish a prima facie case of disability discrimination, Middlesex Hospital claims that there are legitimate non-discriminatory reasons for her termination and Ms. Lamitie's inability to find employment during the transition period. *Id.* at 21. Middlesex Hospital staff allegedly notified Ms. Lamitie as early as March 18, 2015 that she would likely have to find a position outside of the department because of her dissatisfaction with her role and the disruption of department operations. *Id.* at 22.

Finally, alternative grounds for termination would also negate the alleged discrimination. Middlesex Hospital argues that Ms. Lamitie started working thirty hours a week for another company, while still employed at the Hospital and without informing Middlesex Hospital staff. *Id.* Moreover, Ms. Lamitie admitted to attending therapy sessions without clocking out, which led to Middlesex Hospital overpaying her. This additional employment arguably negates Ms. Lamitie's claim for reinstatement as equitable relief.

In response, Ms. Lamitie argues that her claim is not time-barred because, while she was

removed from her position on August 12, 2015, she was not terminated until March 31, 2016. Pl.'s Mem. in Opp'n to Def.'s Mot. for Summ. J., at 9. Ms. Lamitie then filed administrative complaints with the EEOC and the Connecticut Commission on Human Rights and Opportunities ("CHRO"), only pursuing litigation after her claim was released from the respective administrative agencies. *Id.* at 9–10. Because the legal claims raised before this Court are reasonably related to the legal claims made in the administrative action, Ms. Lamitie argues that the claims are not time-barred. *Id.* at 10–11. Moreover, Middlesex Hospital failed to make an argument about exhaustion of administrative remedies in its Amended Answer and Special Defenses, filed on September 26, 2018; thus, the Court should still review this claim. *Id.* at 11.

Ms. Lamitie also argues that she can establish all of the relevant elements of a prima facie case of ADA discrimination. *Id.* at 13–14. Specifically, she argues that Middlesex Hospital only disputes the causal connection between the adverse employment action and Ms. Lamitie's disability, but Ms. Lamitie argues that such a determination should be made by the jury because she was not given a performance improvement plan, like other employees, and assertions by Middlesex Hospital staff that Ms. Lamitie was disruptive only serves as a pretext for a discriminatory termination. *Id.* at 14–17. Ms. Lamitie contends that the lack of a performance improvement plan, documented goal-setting, or clear communication about issues were all inconsistent with Middlesex Hospital policy, and thus illustrate Middlesex Hospital's discrimination against Ms. Lamitie, when compared to other similarly situated staff. *Id.* at 18–20.

In reply, Middlesex Hospital argues that Ms. Lamitie failed to exhaust administrative remedies because it is the adverse action that begins the clock for statute of limitations purposes, not the end of state or federal administrative proceedings. Reply, at 5. Moreover, Middlesex Hospital contends that Ms. Lamitie failed to show that she was treated less favorably because of

her disability. *Id.* at 6.

### 1. The Timeliness of the ADA Claim

Before bringing an ADA claim in federal court, a plaintiff must "must exhaust administrative remedies through the EEOC." *Soules v. Conn., Dep't of Emergency Servs. & Pub. Protection*, 882 F.3d 52, 57 (2d Cir. 2018) (citations omitted). Ordinarily, a plaintiff must file a charge of discrimination with the EEOC within 180 days or, in states like Connecticut that have local administrative mechanisms to pursue discriminatory claims, "within three hundred days after the alleged unlawful employment practice occurred." 42 U.S.C. § 2000e-5(e)(1). A plaintiff must then file a federal court action within ninety days of receiving the right-to-sue letter from the EEOC. 42 U.S.C. § 2000e-5(f)(1).

The Supreme Court has stated that "strict adherence to the procedural requirements specified by the legislature is the best guarantee of evenhanded administration of the law." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 108 (2002) (quoting *Mohasco Corp. v. Silver*, 447 U.S. 807, 826, (1980)). The Supreme Court made clear that the "practice," refers to "a discrete act or single 'occurrence,'" and that "a discrete retaliatory or discriminatory act 'occurred' on the day that it 'happened.'" *Id.* at 110–11. Within the statutory requirements, a plaintiff must therefore "file a charge within either 180 or 300 days of the date of the act or lose the ability to recover for it." *Id.* at 110.

While "[e]ach discrete discriminatory act starts a new clock for filing charges alleging that act," those "discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges." *Id.* at 113. "The existence of past acts and the employee's prior knowledge of their occurrence, however, does not bar employees from filing charges about related discrete acts so long as the acts are independently discriminatory and

charges addressing those acts are themselves timely filed. Nor does the statute bar an employee from using the prior acts as background evidence in support of a timely claim." *Id.*

Here, the relevant adverse employment action for jurisdictional purposes is the March 31, 2016 termination because there were no adverse employment actions within the operable time period. As noted earlier, there are three possible discriminatory episodes on this record: (1) the March 2015 e-mail exchanges between Linn Lamitie and Mr. Nokes; (2) the August 12, 2015 involuntary paid leave the Hospital imposed on Ms. Lamitie; and the Hospital's March 31, 2016 termination of Ms. Lamitie. Yet, only the final action, the March 31, 2016 termination, is a viable claim under the ADA.

Ms. Lamitie brought a disability discrimination charge against Middlesex Hospital before EEOC and CHRO on July 11, 2016, *see* Compl., at ¶ 4, which only allows for Ms. Lamitie's March 31, 2016 termination to be reviewed under both the ADA and CFEPA. Under 42 U.S.C. § 2000e-5(e)(1), Ms. Lamitie's operable claims are only those within 300 days of her July 11, 2016 filing with the EEOC, which would include all potentially discriminatory occurrences on or after September 15, 2016. Thus, her federal disability claims were timely filed, but only as they relate to the March 31, 2016 termination date—rendering other potential discriminatory conduct applicable to Ms. Lamitie's ADA claim only as background information for the March 31, 2016 termination. *See Morgan*, 536 U.S. at 113 (recognizing that anti-discrimination statutes do not "bar an employee from using the prior acts as background evidence in support of a timely claim").

### 2. Disability Under the ADA

The ADA defines a disability as "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such impairment; or

(C) being regarded as having such an impairment." 42 U.S.C. § 12102(1). Major life activities "include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2)(A).

According to Ms. Lamitie, she is "a person with a disability, because [she is] a person who suffers from depression and anxiety, or because [she has] a history of suffering from depression and anxiety, or because the respondent perceives [her] as a disabled person who suffers from depression and anxiety." Lamitie Aff., at ¶ 3. She also was diagnosed by her therapist as "currently fac[ing] destabilizing psychosocial stressors" that "will require time away from work for psychiatric appointments &/or more intensive interventions depending on nature, severity, & progression of other symptoms or illness," with possible incapacitation in the future if her condition worsens. July 29, 2015 FMLA Certification. A jury thus could determine that Ms. Lamitie is limited in one or more major life activity.

Ms. Lamitie can also show that she has either a record of impairment or has been "regarded as having such an impairment . . . ." 42 U.S.C. § 12102(1). "An individual meets the requirements of 'being regarded as having such an impairment' if the individual establishes that he or she has been subjected to an action prohibited under this Act because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity." U.S.C. § 12102(1)(C).

In the Second Circuit, a plaintiff is "only required to raise a genuine issue of material fact about whether [the defendants] regarded him as having a mental or physical impairment." *Hilton v. Wright*, 673 F.3d 120, 129 (2d Cir. 2012). A plaintiff is "not required to present evidence of how or to what degree they believed the impairment affected him." *Id.*

Here, Ms. Lamitie was diagnosed with and notified Middlesex Hospital of her depression in 2013. Lamitie Aff., at ¶¶ 3, 4; Def.'s SUF, at ¶ 16. Ms. Lamitie received FMLA leave in November and December 2014 to participate in a group therapy program. Lamitie Aff., at ¶ 9. On this record, Middlesex Hospital thus had knowledge of Ms. Lamitie's disability.

### 2. The Essential Function Standard

Ms. Lamitie bears the burden of proving, by a preponderance of the evidence, that she is capable of performing the essential functions of her job. *See McMillian*, 711 F.3d at 125. Within the Second Circuit, "[c]ourts 'must give considerable deference to an employer's judgment regarding what functions are essential for service in a particular position . . . .'" *Stevens v. Rite Aid Corp.*, 851 F.3d 224, 229 (2d Cir. 2017) (quoting *Shannon v. N.Y.C. Transit Auth.*, 332 F.3d 95, 100 (2d Cir. 2003)).

Here, Ms. Lamitie's credit collections position required scanning checks, processing cash, and processing credit card payments. *See* Cash Processor Job Description, ECF No. 36-7. And neither party disputes that Ms. Lamitie can perform the essential functions of the job— whether or not there is an associated reasonable accommodation.

### 3. The Retaliation Claim

An ADA retaliation claim is considered under the same retaliation and burden-shifting analysis as the FMLA where "[a] plaintiff must establish a prima facie case; the employer must offer through the introduction of admissible evidence a legitimate non-discriminatory reason for the discharge; and the plaintiff must then produce evidence and carry the burden of persuasion that the proffered reason is a pretext." *See McBride*, 583 F.3d at 96 (citing *Sista*, 445 F.3d at 169); *see also Mendillo v. Prudential Ins. Co. of Am.*, 156 F. Supp. 3d 317, 347 (D. Conn. 2016) (adopting and applying the retaliation analysis of an earlier ADA claim to an FMLA claim)

(Bolden, J.).

While termination is one of the paradigmatic examples of an adverse employment action, *see Vega*, 801 F.3d at 85, Ms. Lamitie has not shown a causal connection between her termination and retaliatory animus for asserting her ADA rights or that her termination was motivated by retaliatory animus. As with her FMLA claim, from the start of the involuntary paid leave until the termination, there is no evidence in the record from which a jury could infer a causal connection between her alleged disability and her March 31, 2016 termination.

Further, as discussed above with respect to the FMLA claim, neither the alleged disparate use of Middlesex Hospital's performance improvement policy nor Ms. McNeil's deposition testimony create genuine issues of material fact. There is no evidence that the Hospital would have given a similarly situated non-disabled person in Ms. Lamitie's position a performance improvement plan *See supra* Section III.A.1.c, at 17–18. Indeed, Ms. McNeil's testimony suggests the contrary. Ms. McNeil, who wondered why Ms. Lamitie was not terminated earlier, thus cannot be used to infer that Ms. McNeil was fired improperly or should not have been fired at all. *See supra* III.A.1.c., at 18–19.

In any event, even if Ms. Lamitie had a prima facie case, just as with her FMLA claim, this claim would be insufficient to carry her burden, given that the burden would shift back to her, given Middlesex Hospital's legitimate non-discriminatory reasons for her March 31, 2016 termination, and she has not created a genuine issue of material fact sufficient to carry her ultimate burden of persuasion on her ADA retaliation claim.

Accordingly, the Court will grant Middlesex Hospital's motion for summary judgment as to Ms. Lamitie's ADA claim.[7]

---

[7] Because the Court otherwise determines that Ms. Lamitie lacks a viable ADA claim, the Court need not address the Hospital's alternative arguments as to the propriety of her termination or any allegedly related damages.

### C.     State and Retaliation Claims

Having dismissed Ms. Lamitie's federal claims, the Court declines to take supplemental jurisdiction over Ms. Lamitie's remaining state law claims. *Kolari v. N.Y.-Presbyterian Hosp.*, 455 F.3d 118, 122 (2d Cir. 2006) ("a district court 'may decline to exercise supplemental jurisdiction' if it 'has dismissed all claims over which it has original jurisdiction'" (citing 28 U.S.C. § 1367(c)(3)).

## IV.   CONCLUSION

For the foregoing reasons, the Court **GRANTS** Middlesex Hospital's motion for summary judgment.

The Court also declines to exercise supplemental jurisdiction over Ms. Lamitie's CFEPA claim.

The Clerk of the Court is respectfully directed to close this case.

**SO ORDERED** at Bridgeport, Connecticut, this 10th day of May 2019.

/s/ Victor A. Bolden
VICTOR A. BOLDEN
UNITED STATES DISTRICT JUDGE